UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RASAGNYA VISWANADHA, ZIMMER,
INC.,

      Plaintiffs,

      v.                                Case No. 3:22-CV-75 JD

ALEJANDRO MAYORKAS, US
CITIZENSHIP AND IMMIGRATION
SERVICES, UR M. JADDOU,

      Defendants.

**OPINION AND ORDER**

Dr. Rasagnya Viswanadha is a Canadian citizen employed by Zimmer, Inc. In April 2020, Zimmer filed a Form I-140 Petition seeking an EB-1 "Outstanding Professor or Researcher" visa for Dr. Viswanadha. This petition was initially denied by the United States Citizenship and Immigration Services ("USCIS") through its Nebraska Service Center ("NSC"). Zimmer then appealed this decision to USCIS's Administrative Appeals Office ("AAO"). The AAO also concluded that Dr. Viswanadha did not qualify for the EB-1 "Outstanding Professor or Researcher" visa and dismissed the appeal.

Dr. Viswanadha and Zimmer (collectively, the "Plaintiffs") filed a lawsuit alleging that USCIS's decision was arbitrary and capricious and in violation of the Administrative Procedure Act ("APA"). The Court now considers a motion for summary judgment brought by the Plaintiffs and a cross motion for summary judgment brought by Defendants Alejandro Mayorkas, U.S. Citizenship and Immigration Services, and Ur M. Jaddou (collectively, the

"Defendants").[1] Because the Plaintiffs have failed to show that the decision by USCIS was arbitrary or capricious, the Court will deny Plaintiffs' motion and grant Defendants' motion.

## A.    Factual Background

In March 2018, Dr. Rasagnya Viswanadha, a Canadian citizen, accepted a job offer to work at Zimmer as a principal research scientist. (R. 706, 864–65.) Dr. Viswanadha was initially admitted under an H-1B employment-based visa. (R. 724.) An H-1B visa allows businesses in the United States to temporarily employ foreign workers in "specialty occupations," defined as those "that typically require at least a bachelor's degree in a specific field of study." *Rubman v. U.S. Citizenship & Immigr. Servs.*, 800 F.3d 381, 384 (7th Cir. 2015). Individuals holding an H-1B visa "are able to work in the U.S. for three years (extendable to six), after which they must apply for a different visa or return to their home country . . . ." *Id.*

On April 8, 2020, Zimmer filed a Form I-140, with supporting documentation, seeking an EB-1 "Outstanding Professor or Researcher" immigrant visa under the provisions of 8 U.S.C. § 1153(b)(1)(B). (R. 696–705.) A Form I-140 is the name for the immigrant visa petition filed by an employer, which requests that an employee be assigned to "one of the INA's immigrant visa preference categories for employment-based permanent residency." *Musunuru v. Lynch*, 831 F.3d 880, 883 (7th Cir. 2016) (citing 8 U.S.C. §§ 1154(a)(1)(F), 1255(a)(2)). This petition must be filed by the employer and be approved by USCIS prior to the alien having his or her status changed to a lawfully admitted permanent resident. 8 U.S.C. §§ 1154(a)(1)(F), 1255(a)(2).[2] In its

---

[1] Mr. Mayorkas is the Secretary of the Department of Homeland Security. (DE 1.) Ms. Jaddou is the Director of USCIS. (*Id.*)

[2] Approval of an I-140 petition merely makes the worker *eligible* to receive a visa "because there is a quota where only a certain number of visas are made available per country of origin each calendar quarter." *Musunuru*, 831 F.3d at 883 (citing 8 U.S.C. §§ 1151(a)(2), 1152(a)). An alien may only become a permanent resident after (1) having an approved I-140 petition, (2) having an immigrant visa immediately available when filing an application for an

petition, Zimmer asserted that Dr. Viswanadha was "an internationally recognized and outstanding researcher in the fields of cell biology and physiology." (R. 706.)

USCIS analyzes a petition to classify an alien as an outstanding professor or researcher in two steps. United States Citizenship and Immigration Services, 6 USCIS Policy Manual F.3, https://www.uscis.gov/policy-manual/volume-6-part-f-chapter-3 (last visited March 3, 2023). First, USCIS assesses "whether evidence meets regulatory criteria . . . ." *Id.* This step requires that the professor or researcher meet at least two of six regulatory criteria set forth in 8 C.F.R. § 204.5(i)(3)(i). Second, after determining if the evidence meets two of the regulatory criteria, USCIS engages in a "final merits determination" where it evaluates "all the evidence together when considering the petition in its entirety . . . in the context of the high level of expertise required for this immigrant classification." *Id.*

As to the first step, Zimmer argued in its petition that Dr. Viswanadha met all six of the evidentiary criteria established by 8 C.F.R. § 204.5(i)(3)(i). Zimmer also asserted that "Dr. Viswanadha's level of achievement in her field [was] evidenced by a degree of skill and recognition substantially above that ordinarily encountered, and among the upper echelon of professionals in her field thus demonstrating that she is an outstanding professor or researcher on her final merits." (R. 707.) In support, Zimmer filed over 500 pages of documents, including: scholarly articles and book chapters written by Dr. Viswanadha (R. 1428–1687, 1693); citations to this work by other academics (R. 919–20, 946–1055); reference letters from other experts (R. 898, 922–46, 1158–1425); an interview with Dr. Viswanadha (R. 1689); emails indicating that she had reviewed another individual's paper, judged certain scientific competitions, and was invited to speak at certain conferences (R. 1695–1716); four Zimmer Biomet Impact Awards;

---

adjustment of status, and (3) filing an application for an adjustment of status to permanent resident. 8 U.S.C. § 1255(a).

letters demonstrating her membership in various professional organizations (R. 1056–1079); and multiple provisional patent applications where she had been named as an inventor (R. 1081–1157).

After considering this evidence, USCIS's Nebraska Service Center ("NSC") sent Zimmer and Dr. Viswanadha a notice of its intent to deny Zimmer's petition. (R. 663.) While the NSC found that Dr. Viswanadha met two of the six initial evidentiary criteria, it denied the petition during its final merits review. During this final merits review, the NSC provided several reasons why the supporting documentation was insufficient to establish that Dr. Viswanadha was internationally recognized as an outstanding researcher in cell biology and physiology.

First, the NSC reasoned that certain evidence showing the originality of Dr. Viswanadha's work did not necessarily show that she was internationally recognized as outstanding. As to Dr. Viswanadha's scholarly research, the NSC wrote that the mere fact that an individual "engaged in original research studies and produced original results" does not mean "that every researcher who performs original research that adds to the pool of knowledge in his or her field has inherently made an original contribution to the academic field as a whole." (R. 667.) Similarly, in regard to being a referenced inventor of two patents, the NSC noted that while "the issuance of a patent does verify the originality of a device or process, the significance of an invention is not evaluated during the application process." (R. 668.)

The NSC also reasoned that Zimmer failed to provide sufficient evidence showing that Dr. Viswanadha's research stood out as outstanding relative to her peers. For example, as to evidence that Dr. Viswanadha reviewed "one manuscript in the academic field," the NSC wrote this was not sufficient to demonstrate that her "participation in the widespread peer-review process (a routine process in the field relying on many scientists) exceeds that of other

researchers or reflects international recognition." (R. 667.) The NSC also came to the same conclusion regarding the 53 citations that Dr. Viswanadha's published research had accumulated, writing that merely showing that "distinguished scholars have cited to the beneficiary's work" did not demonstrate "superiority or distinction [going] beyond what a graduate student can claim." (R. 668.)

Furthermore, the NSC discounted certain evidence because it was unrelated to Dr. Viswanadha's claimed academic field of cell biology and physiology. For example, Zimmer submitted evidence that Dr. Viswanadha served as a reviewer for the Purdue Undergraduate Research Pitch Competition, the Georgia Tech Capstone Design Expo, and Northeast Indiana Regional Science and Engineering fair. (R. 1707–1717.) However, "the emails inviting and thanking the beneficiary for her service at these events [did] not articulate whether her judging related to her academic field." (R. at 668.)

Finally, the NSC explained that it gave certain references submitted on behalf of Dr. Viswanadha less weight because the individuals providing those statements had personal relationships with the defendant or had written the letters solely for the purpose of supporting her immigrant petition.[3] Zimmer filed approximately 20 letters from other scientists serving as references for Dr. Viswanadha. (R. 898, 922–46, 1158–1425.) For example, Dr. Hannah Mitchison, a professor of molecular medicine at University College London, wrote that "Dr. Viswanadha's research on ciliary dynein assembly has laid the foundation for a multitude of studies in ciliary biology" and that "her outstanding researching [was] used . . . as the basis for my own work." (R. 922–46.) Multiple other similar letters were filed. (R. 898, 1158–1425.)

---

[3] The NSC also noted that the one manuscript review was from one of Dr. Viswanadha's "former colleagues" and discounted it on that basis. (R. at 667.)

However, the NSC found that these letters did not demonstrate she was "recognized internationally as outstanding in the academic field" because most of the letters were "written by experts who have employed, instructed, or collaborated" with Dr. Viswanadha. The NSC was also concerned that the letters were "solicited by the beneficiary for the sole purpose of supporting her immigrant petition." (R. 668.)

After issuing its notice of denial, the NSC notified Zimmer it had 30 days to submit further evidence in response. (R. 669.). Zimmer did provide some additional evidence, but the NSC issued a decision denying the petition along largely the same grounds. (R. 191.) However, the NSC now also wrote that "the letters from independent experts from across the globe appear to be fabricated" due to the letters using "the same language to discuss the beneficiary's research." (R. 191–92.)

Zimmer then filed an appeal to USCIS's Administrative Appeals Office ("AAO"). (R. 13.) In this appeal, Zimmer recognized that step one of the two-step analysis had already been met and therefore "focused [its argument] solely" on step two: whether Dr. Viswanadha was "an outstanding researcher after considering the evidence as a whole in the context of a final merits determination." (R. 16.) Zimmer also provided an updated list of citations to her article. (R. 190 (indicating that she has been cited 61 times to her five most published articles); R. 4 (indicating she has 67 international citations to her two most important works).) Additionally, Zimmer now asserted that Dr. Viswanadha's field was ciliary biology, rather than cell biology and physiology.[4] (R. 33.)

_____

[4] The AAO, in its opinion, explained that "a petitioner may not make material changes to a petition in an effort to make a deficient petition conform to USCIS requirements" and that "[t]he Petitioner must submit evidence to demonstrate that the Beneficiary is recognized as outstanding in the academic field specified in the petition." (R. 3 n.2.) The AAO also explained that "ciliary biology" would not be recognized as an "academic field" because, under the regulatory definition, an academic field is a "body of specialized knowledge offered for study at an accredited U.S. university or institution of higher education" and the petitioner did not present any evidence that "ciliary

On September 17, 2021, the AAO issued a determination dismissing Zimmer's appeal. The AAO first determined that it agreed with the NSC as to step one of the analysis and concluded that Dr. Viswanadha met at least two of the six regulatory criteria. At step two, the AAO again agreed with the NSC's conclusion and determined that, after a "review of the totality of the evidence," Zimmer failed to establish that Dr. Viswanadha was "internationally recognized as an outstanding professor or researcher in the academic field." In doing so, the AAO largely concurred with the reasoning of NSC. For example, like the NSC decision, the AAO determined that the patent applications where Dr. Viswanadha was listed as an inventor did not, by themselves, demonstrate international recognition or outstanding achievement because while "a patent recognizes originality" it does not necessarily show the "significance of the innovation." (R. 9.) Additionally, like the NSC, the AAO determined that the evidence submitted regarding Dr. Viswanadha judging the work of others did not show that this judging was related to "the fields of cell biology and physiology" because the documentation "did not indicate whose work" was judged, their stature, or the research projects evaluated. (R. 5.) Furthermore, like the NSC, the AAO concluded that Dr. Viswanadha providing informal input on a research paper and receiving invitations to speak at conferences did not "differentiat[e] her from others in her field" so as to demonstrate she was "recognized internationally with the academic field as outstanding."(R. at 6–7.)

However, the AAO did disagree with the NSC's notice in two respects. First, the AAO found that the letters from other academics should not be discounted "simply because they were obtained for the purpose of supporting this petition." (R. 4.) Second, the AAO found that the NSC's assertion that the letters "appear to be fabricated" was unsupported. (*Id.*) The AAO then

biology" was offered for study at an accredited U.S. university or institution of higher education. (*Id.*) Accordingly, the AAO used "cell biology and physiology" as the relevant academic field.

independently reviewed and considered each of the letters submitted by Zimmer. (R. 7 n.13.) After conducting this review, the AAO concluded that even though many of the letters indicated that Dr. Viswanadha's research contributed to the "cilia field," the letters did not detail how Dr. Viswanadha's "findings . . . advanced the state of research in the academic field [of cell biology and physiology] or explain how the Beneficiary's work has influenced the wider field beyond the teams of researchers who have directly cited to the Beneficiary's articles." (R. 8.) Meaning, while the AAO disagreed with why the NSC discounted the letters, the AAO found that the letters did not demonstrate that Dr. Viswanadha was internationally recognized as outstanding in cell biology on separate grounds. The AAO ultimately dismissed the appeal concluding that "[a] review of the totality of the evidence . . . does not establish that [Dr. Viswanadha] is internationally recognized as an outstanding professor or researcher in the academic field." (R. 12.)

Following the AAO's decision, Zimmer and Dr. Viswanadha (the "Plaintiffs") filed a complaint against Alejandro Mayorkas (the Secretary of the Department of Homeland Security), Ur M. Jaddou (the director of USCIS), and USCIS. (DE 1.) Plaintiffs brought one claim for violation of the Administrative Procedure Act, 5 U.S.C. § 701, alleging that USCIS's decision to deny Plaintiffs' I-140 Petition was arbitrary and capricious. Plaintiffs filed a motion for summary judgment. (DE 24.) Defendants then filed a cross motion for summary judgment. (DE 27.) These motions are now ripe for review.

## B.    Standard of Review

Under the APA, courts set aside agency action "only if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence in the case, or not in accordance with the law." *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 853 (7th Cir. 2009); *see also* 5 U.S.C. §

706(2). These standards overlap. *Orchard Hill Bldg. Co. v. United States Army Corps of Engineers*, 893 F.3d 1017, 1024 (7th Cir. 2018). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). When reviewing whether an action is arbitrary and capricious, the Court "ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*; *see also Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016) (explaining that a decision is arbitrary and capricious if it "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). "A determination is unsupported by substantial evidence when the record lacks evidence that a reasonable mind might accept as adequate to support the conclusion." *Orchard Hill Bldg. Co.*, 893 F.3d at 1024 (citations and quotation marks omitted). Under both standards, "the scope of review is narrow and a court must not substitute its judgment for that of the agency." *Id.* (citations and quotation marks omitted). Furthermore, when conducting its review, the district court is "confined to the administrative record[.]" *Little Co. of Mary Hosp.*, 587 F.3d at 856.

"APA cases are often resolved at summary judgment because whether an agency's decision is arbitrary and capricious is a legal question that the court can usually resolve on the agency record." *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022) (citing *Univ. Med. Ctr. of S. Nevada v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999)). Rather than determining whether there is a genuine dispute of material fact as in a typical summary judgment case, in cases "involving review of a final agency action under the APA, 'summary judgment instead serves as a mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with

the APA standard of review.'" *Star Way Lines v. Walsh*, 596 F. Supp. 3d 1142, 1149 (N.D. Ill. 2022) (quoting *Fisher v. Pension Guard. Corp*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020)). "So, [t]o survive summary judgment under the APA, the plaintiffs must point to facts or factual failings in the administrative record that indicate that the [agency's] decision is arbitrary, capricious, an abuse of discretion, [unsupported by substantial evidence,] or otherwise not in accordance with law." *Id.* (citation and quotation marks omitted).

## C.   Discussion

Plaintiffs argue that the denial by USCIS was arbitrary and capricious for several reasons. First, they assert that that the level of scrutiny applied by USCIS was based on *ultra vires* agency guidance which improperly imposed an additional "final merits determination" not otherwise embodied in the statute. (DE 24 at 3.) Second, they argue that the agency's decision was arbitrary and capricious because they disregarded multiple categories of valid evidence. (*Id.* at 12–20.) The Court will address each of these arguments, but first explains the statutory and regulatory background in order to provide context.

### *1.   Statutory and Regulatory Framework*

The Immigration Act of 1990 (the "Act") expanded the United States visa system by increasing the number of employment-based immigrants admitted annually to 140,000. 8 U.S.C. 1151(d)(1)(A). If awarded, these employment-based immigrant visas give the alien permanent resident status in the United States. 8 U.S.C. § 1151(a). The Act allocates employment-based visas based on five categories of immigrants: (1) priority workers; (2) aliens who are members of the professions holding advanced degrees or aliens of exceptional ability; (3) skilled workers, professionals, and other workers; (4) certain special immigrants; and (5) aliens entering the United States for the purpose of engaging in a new commercial enterprise. 8 U.S.C. § 1153(b).

Each of these categories receives a certain portion of the total employment-based visas allocated each year.

The first category of visa, priority workers, is called an EB-1 visa. It is further subdivided into three categories: (a) aliens with extraordinary ability in the sciences, arts, education, business, or athletics; (b) outstanding professors and researchers; and (c) certain multinational executives and managers. 8 U.S.C. § 1153(b)(1). Priority workers visas contain certain advantages compared to other categories. For example, if an alien were to apply for an "exceptional ability" employment-based visa, or a "skilled workers" employment-based visa, they would have to go through a labor certification process. 8 C.F.R. § 204.5(k)(4), (l)(3)(i). This process can often be quite time-consuming, since it "requires that employers first test the marketplace for existing qualified domestic workers." *Kazarian v. U.S. Citizenship & Immigr. Servs.*, 596 F.3d 1115, 1120 (9th Cir. 2010); *see also* 20 C.F.R. § 656.17 (containing the regulations surrounding the basic labor certification process, including setting forth the typical pre-filing recruitment process, which requires employers to demonstrate that they advertised the position and took additional recruitment steps, such as conducting a job fair, on-campus recruiting, or used a private employment firm, among others). However, the "extraordinary ability" visa, the "outstanding professors and researchers" visa, and the "multinational executives and managers" visa do not require this time-consuming labor certification process. 8 C.F.R. § 204.5(h)(5), (i)(iv), (j)(5).

Accordingly, an employer may opt to petition for a visa with more stringent requirements in the hopes of avoiding this time-intensive work certification process. Zimmer opted to take that route when it filed a petition seeking to classify Dr. Viswanadha as an outstanding researcher under 8 U.S.C. § 1153(b)(1)(B).

To qualify for a visa in this category, Zimmer was required by statute to show that Dr. Viswanadha: (1) was "recognized internationally as outstanding in a specific academic area," (2) had "at least 3 years of experience in teaching or research in the academic area," and (3) sought to enter the United States for a "tenured" or "comparable position with a university of higher education," or private employer to teach or conduct research in that academic area. 8 U.S.C. § 1153(b)(1)(B)(i)-(iii). The parties do not dispute that Dr. Viswanadha had at least 3 years of experience in research or that she had a comparable position at a private employer conducting research. Rather, the dispute centers around whether Dr. Viswanadha was "recognized internationally as outstanding in a specific academic area."

USCIS explains who is considered an "outstanding professor and researcher" in a notice-and-comment rule. 8 C.F.R. § 204.5(i). This rule specifies that, as "initial evidence," a "petition for an outstanding professor or researcher must be accompanied by":

> (i) Evidence that the professor or researcher is recognized internationally as outstanding in the academic field specified in the petition. Such evidence shall consist of at least two of the following:
>
>> (A) Documentation of the alien's receipt of major prizes or awards for outstanding achievement in the academic field;
>>
>> (B) Documentation of the alien's membership in associations in the academic field which require outstanding achievements of their members;
>>
>> (C) Published material in professional publications written by others about the alien's work in the academic field. Such material shall include the title, date, and author of the material, and any necessary translation;
>>
>> (D) Evidence of the alien's participation, either individually or on a panel, as the judge of the work of others in the same or an allied academic field;
>>
>> (E) Evidence of the alien's original scientific or scholarly research contributions to the academic field; or
>>
>> (F) Evidence of the alien's authorship of scholarly books or articles (in scholarly journals with international circulation) in the academic field.

8 C.F.R. § 204.5(i)(3).

A policy manual issued by USCIS provides further guidance to officers assessing an outstanding professor or researcher application. United States Citizenship and Immigration Services, 6 USCIS Policy Manual F.3, https://www.uscis.gov/policy-manual/volume-6-part-f-chapter-3 (last visited March 3, 2023). This policy manual advises that "[o]fficers should use a two-step analysis to evaluate the evidence submitted with the petition." *Id*. At step one, the officer analyses whether evidence meets the six regulatory criteria under 8 C.F.R. § 204.5(i)(3). At step two, the officer engages in a "final merits determination" where the officer "evaluate[s] all the evidence together when considering the petition in its entirety. . . in the context of the high level of expertise required for this immigrant classification." *Id.* This statement in the policy manual is based on the process outlined in *Kazarian v. USCIS*, 596 F.3d 1115 (9th Cir. 2010). Accordingly, the process is colloquially referred to as the "*Kazarian* analysis." *See Arbor Home, LLC v. Mayorkas*, 604 F. Supp. 3d 878, 887 (N.D. Cal. 2022) (referring to this two-step process as the "*Kazarian* analysis"); *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 545 (S.D.N.Y. 2012) (same).

The Plaintiffs object to using the *Kazarian* analysis in this context, asserting that USCIS lacks the authority to conduct a "final merits determination"

### 2.  The Two-Step Kazarian Analysis is not an Improper Ultra-Vires Requirement

Plaintiffs raise two distinct procedural arguments to the legal framework that the agency applied. First, Plaintiffs argue that application of the *Kazarian* policy and the "final merits determination" went beyond "the analysis contemplated by congress." (DE 24 at 22.) Second, Plaintiffs argue that the two-step *Kazarian* analysis cannot be "mandated without notice and comment." (DE 24 at 24.)

Prior to addressing these arguments, the Court notes as an initial matter that Plaintiffs repeatedly misidentify the regulatory criteria enumerated in 8 C.F.R. § 204.5(i)(3) as "statutory requirements." (DE 24 at 11 ("USCIS found that Dr. Viswanadha met *the statutory requirements pursuant to two of the enumerated criteria* . . . 8 C.F.R. § 204.5(i)(3)(i)(D) . . . and 8 C.F.R. § 204.5(i)(3)(i)(F)"; *Id.* at 20 ("USCIS agreed that Dr. Viswanadha met the *requisite statutory elements* to receive the outstanding Professor and Researchers classification *(two of six statutory factors)*;" *Id.* at 23, 25.) Plaintiffs also imply that 8 C.F.R. § 204.5 was drafted by Congress. (DE 24 at 3 ("Dr. Viswanadha met two of the criteria of 8 C.F.R. § 204.5(i)(3)(i)(A)–(E), *as envisioned by Congress* for approval"); *Id.* at 23 ("[Dr. Viswanadha] has qualified under the *statutory provisions outlined in the regulations envisioned by Congress*."); *Id.* at 25 ("Dr. Viswanadha has met the requirements *as outlined by Congress* in 8 C.F.R. § 204.5(i)(3)(i)(A)–(E).).

However, 8 C.F.R. § 204.5(i)(3)(i)(A)–(E) is not a statute and was not drafted by Congress. First, that this section was published in the "Code of Federal *Regulations*" (or, when made into an acronym, "C.F.R.") indicates that the sections therein are not statutes. *See also* Code of Federal Regulations Definition, *Black's Law Dictionary* (11th ed. 2019) (explaining that the Code of Federal Regulations is "[t]he collection of *executive-agency* regulations published in the daily Federal Register"). Second, Congress delegated authority for issuing regulations related to immigration to the Department of Homeland Security. Under 8 U.S.C. § 1103(a)(1), Congress charged the Secretary of Homeland Security with "the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens . . . ." *See Bayou Lawn & Landscape Servs. v. Johnson*, 173 F. Supp. 3d 1271, 1289 (N.D. Fla. 2016) (explaining that "Congress has vested DHS with broad authority to regulate the admission of

14

nonimmigrant aliens," citing to 8 U.S.C. § 1103(a)). That section also gave the Secretary of Homeland Security authority "to establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter." 8 U.S.C. § 1103(a)(3); *see also City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 944 F.3d 773, 798 n.16 (9th Cir. 2019) (explaining that "Congress has authorized DHS to adopt regulations," citing to 8 U.S.C. § 1103(a)(3)).

Given that 8 C.F.R. § 204.5(i)(3)(i)(A)–(E) is clearly not a statute, it appears that the Plaintiffs are, in fact, arguing that the *Kazarian* analysis conflicts with the regulation. However, even with this generous interpretation, such an argument fails.

The agency's two-part *Kazarian* analysis is consistent with both the statute and the regulation. The statutory text merely indicates that the alien must be "recognized internationally as outstanding in a specific academic area[.]" 8 U.S.C. 1153(b)(1)(B)(i). It does not include further criteria elaborating on what must be shown in order to demonstrate that the alien is "recognized internationally as outstanding in a specific academic area." DHS, however, did choose to issue a regulation addressing what was necessary to be "recognized internationally as outstanding in a specific academic area."[5] The regulation provides that an alien must present evidence satisfying two of the six enumerated criteria. 8 C.F.R. § 204.5(i)(3).

However, just because meeting two of the six criteria is necessary to qualify as being "recognized internationally as outstanding in a specific academic area," this does not mean that meeting two of the criteria is sufficient by itself. For example, being 18 years old is a necessary

---

[5] While their brief is somewhat confusing due to their misuse of the term "regulation" and "statute," the Plaintiffs do not appear to raise the argument that 8 C.F.R. § 204.5 is in conflict with 8 U.S.C. 1153(b)(1)(B). To the extent this is the argument that Plaintiffs are making, it is waived. *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("Moreover, perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").

condition for voting in a federal election, but it is not a sufficient condition. The word choice in this subsection indicates that the regulation was merely setting forth a necessary condition, rather than a sufficient condition. First, the regulation includes these six criteria under a heading reading, "*initial evidence,*" which implies that even if evidence was presented as to two of the six criteria, some further showing would be required. 8 C.F.R. § 204.5(i)(3). Second, the regulation provides that the evidence consists of "*at least*" two of the six criteria. If two alone were sufficient, then the regulation would likely not invite more proof.

This reading is consistent with how other courts have interpreted the regulation that sets forth the requirements to receive an extraordinary ability visa in 8 C.F.R. § 204.5(h)(3). Like the outstanding researcher visa, the extraordinary ability visa lists the "initial evidence" applicants must include in his or her petition. Under that regulation, as "initial evidence," the applicant can either submit proof of a one-time achievement, such as a Nobel prize, or show that they meet "at least three" of ten listed criteria. 8 C.F.R. § 204.5(h)(3). Furthermore, like the outstanding researcher visa, USCIS conducts the two-step *Kazarian* analysis, first determining that the regulatory criteria have been proved, before moving on to a "final merits determination." United States Citizenship and Immigration Services, 6 USCIS Policy Manual F.2, https://www.uscis.gov/policy-manual/volume-6-part-f-chapter-2 (last visited March 3, 2023).

In *Amin v. Mayorkas*, 24 F.4th 383 (5th Cir. 2022), the Fifth Circuit had to determine whether USCIS's usage of the two-step *Kazarian* analysis was consistent with the text of 8 C.F.R. § 204.5(h)(3). The Fifth Circuit concluded it was consistent. In doing so, the Fifth Circuit relied on two pieces of language found in 8 C.F.R. § 204.5(h)(3) (addressing extraordinary ability visas) that are also found in 8 C.F.R. § 204.5(i)(3) (addressing outstanding professor and researcher visas). The Fifth Circuit explained that 8 C.F.R. § 204.5(h)(3)'s description of the

evidentiary criteria as "initial evidence," alongside the requirement that the applicant "must submit evidence of '*at least* three' criteria . . . contemplate[d] another step beyond submitting the enumerated evidence [because] [i]f satisfying three criteria were enough, why would the agency invite proof of more?" *Id.* at 391. Given that these key phrases appear almost verbatim in the regulation this Court is considering, the Court finds that *Amin*'s conclusion is equally applicable here: namely, that the agency's usage of the *Kazarian* analysis is consistent with 8 C.F.R. § 204.5(i)(3) (addressing outstanding professor and researcher visas).

Plaintiffs' interpretation of the regulation would also go against the statutory text in 8 U.S.C. § 1153(b)(1)(B). Plaintiffs would merely require an applicant to meet two of six of the enumerated regulatory criteria, without any further inquiry. However, 8 U.S.C. § 1153(b)(1)(B) provides that "visas shall be made available . . . to (B) *outstanding* professors and researchers." The act then further explains that an outstanding professor and researcher must be "recognized internationally as outstanding in a specific academic area." 8 U.S.C. § 1153(b)(1)(B)(i). If the Court were to accept Plaintiffs' interpretation, then researchers who had merely judged others' work and had written articles (satisfying two of the regulatory criteria), but who had not demonstrated that this work went beyond that done by the average researcher, would qualify for the visa. In other words, Plaintiffs' interpretation would not require the applicant to prove that their work stood out relative to their peers. Such an interpretation directly conflicts with the statutory text, which requires the applicant be "recognized internationally as outstanding in a specific academic area."

The Fifth Circuit reached a similar conclusion in *Amin*. There, the Plaintiff argued that at the second step, "once an applicant meets three of the ten regulatory criteria" (as required for an extraordinary ability visa), "the regulation shifts the burden to the government to explain why the

applicant has not demonstrated extraordinary ability." *Amin*, 24 F.4th at 391. The statute for an

extraordinary visa requirement includes similar language to the "recognized internationally as

outstanding" requirement in 8 U.S.C. § 1153(b)(1)(B)(i). Specifically, that statute requires that

the extraordinary ability be "demonstrated by sustained national or international acclaim." 8

U.S.C. § 1153(b)(1)(A). The Fifth Circuit concluded that the plaintiff's "view [was] unmoored

from the statute in not requiring an applicant to prove that" they had an "extraordinary ability

which has been demonstrated by sustained national or international acclaim." *Amin*, 24 F.4th at

391.

  Arguably, Plaintiffs interpretation in this case is even more unmoored from the statute's

text. Rather than asserting that meeting two of the criteria shifts the burden to the government,

Plaintiffs here assert that meeting two of the criteria is itself sufficient to end the inquiry. As

explained above, such an interpretation is in conflict with both the text of the regulation (which

sets forth criteria that must be met to show "initial evidence") and the text of the statute (which

requires that the applicant be recognized internationally as outstanding in a specific academic

area). Accordingly, the Court finds that using the two-step *Kazarian* analysis is not in conflict

with the regulation or the statute.[6]

  Plaintiffs raise the related argument that the AAO, throughout their decision, uses the

wrong burden. (DE 24 at 17–19.) In their decision, the AAO dismisses certain evidence because

---

[6] The Court notes that this holding is not predicated on what is often called *Auer* deference, the doctrine that "a court should defer to the agency's construction of its own regulation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). That doctrine only applies if the "regulation is genuinely ambiguous." *Id.* Here, the regulation is quite clear, only setting forth the "initial evidence" required and providing that applicants provide "at least" two of six enumerated criteria. It is apparent from the regulatory text alone that some further analysis is required. Therefore, the Court need not defer to the agency's view, as expressed in the policy manual, because the result is the same as if this Court deferred. *See Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002) (explaining that there is "no point" in deferring when the agency's view is "the position [the court] would adopt . . . interpreting the [regulation] from scratch").

it did not show that it was "widely utilized in the cell biology field," did not show that Dr. Viswanadha's research affected the field of "[c]ell biology in a substantial way," and did not show it had a "meaningful impact" in cell biology. (R. 6–8.) Plaintiffs assert that this analysis was flawed because the regulatory criteria do not require such an impact. However, as previously discussed, during the final merits review, the officer must "evaluate the evidence together when considering the petition in its entirety to make a final merits determination of whether or not petitioner . . . has demonstrated that the beneficiary is recognized internationally as outstanding in a specific academic area." United States Citizenship and Immigration Services, 6 USCIS Policy Manual F.3, https://www.uscis.gov/policy-manual/volume-6-part-f-chapter-3 (last visited March 3, 2023). Inquiring into whether Dr. Viswanadha's work impacted the field of cell biology in a substantial or meaningful way, or if her work was widely utilized in that field, was reasonable given that the purpose of the final merits review was to determine if she was recognized internationally as outstanding in cell biology.

Next, the Court addresses Plaintiffs' argument that the promulgation of the *Kazarian* policy is invalid because the agency failed to offer a notice-and-comment period. Plaintiffs argue that the promulgation of the *Kazarian* analysis in the policy manual was a legislative rule requiring it to go through a notice-and-comment procedure under the APA. Because a notice-and-comment period is required for legislative rules, Plaintiffs assert that the *Kazarian* analysis is invalid. The Court disagrees, finding that the rule is interpretive in nature and does not alter any substantive rights.

Under 5 U.S.C. § 553, an agency must offer notice and comment for legislative rules. However, there is a categorical exemption "of interpretative rules from the notice-and-comment process" under 5 U.S.C. § 553(b)(A). *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015).

Accordingly, whether the guidance provided in the policy manual is legislative or interpretive determines whether a notice-and-comment period had to occur.

Generally speaking, "'legislative rules' are those which create law, usually implement[ing] an existing law." *Alabama Tissue Ctr. of Univ. of Alabama Health Serv. Found., P.C. v. Sullivan*, 975 F.2d 373, 377 (7th Cir. 1992). Meaning, a legislative rule creates a new right or duty. *Metropolitan School Dist. of Wayne Twp., Marion County, Ind. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992) ("[I]f by its action the agency intends to create new law, rights, or duties, the rule is properly considered to be a legislative rule."); *see also Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022) ("Legislative rules impose new rights or duties and change the legal status of regulated parties."). On the other hand, "interpretive rules are statements as to what the administrative officer thinks the statute or regulation means." *Alabama Tissue Ctr. of Univ. of Alabama Health Serv. Found., P.C.*, 975 F.2d at 377. Rather than creating new rights or duties, "interpretive rules merely clarify the requirements that Congress has already put in place." *Mann Constr., Inc.*, 27 F.4th at 1143.

The statute at issue, 8 U.S.C. § 1153(b)(1)(B)(i), by its own terms, required that the applicant be "recognized internationally as outstanding in a specific academic area." The statement in the policy manual clarified that burden of an applicant by instructing officers to engage in a two-step process requiring (1) an initial showing of two of the regulatory criteria (as required by the regulation) and then (2) a final merits review which evaluated "all the evidence together when considering the petition in its entirety . . . in the context of the high level of expertise required for this immigrant classification." United States Citizenship and Immigration Services, 6 USCIS Policy Manual F.3, https://www.uscis.gov/policy-manual/volume-6-part-f-chapter-3 (last visited March 3, 2023). This two-step process merely holds the applicant to the

20

burden envisioned by Congress. As explained previously, only requiring an applicant to satisfy two of the six regulatory criteria would allow for applicants who were not "recognized internationally as outstanding in a specific academic area" to qualify for the outstanding researcher and professor visa. By putting forth this interpretive rule, USCIS did not add to an applicant's burden, but simply provided guidance to USCIS officers that a further inquiry was required beyond the "initial evidence" as set forth in the regulations.

Other courts have reached similar conclusions when considering analogous policies. For example, in *Amin*, the Fifth Circuit found that a USCIS policy memo which set forth the two-step *Kazarian* analysis, as applied to extraordinary ability visas, "merely clarifie[d] the order in which agency adjudicators evaluate the evidence." *Amin*, 24 F.4th at 392. Because the policy memo only clarified how the evidence was evaluated, rather than provide new substantive rights or obligations, the Fifth Circuit held that the policy memo was "not a legislative rule subject to the notice-and-comment requirement." *Id.* While not specifically addressing the *Kazarian* analysis, other courts have also found that policy manuals and memoranda issued by USCIS set forth interpretative rules, rather than legislative rules. *See, e.g., Diaz v. USCIS*, 499 F. App'x 853, 855 (11th Cir. 2012) (per curiam) ("We have held that a field manual or other internal administrative guidance that has not been promulgated in accordance with APA notice-and-comment rule making procedures does not have the force and effect of law."); *see also Almakalani v. McAleenan*, 527 F. Supp. 3d 205, 221–22 (E.D.N.Y. 2021) (finding that USCIS guidance "expressly framed as a policy memorandum, the purpose which is to provide guidance to USCIS officers" was interpretive rather than legislative).

Plaintiffs also argue that guidance had previously been issued with a different interpretation and that notice and comment had to issue in order to apprise the public of the

21

subsequent change. In support of their argument that the agency issued prior guidance, Plaintiffs point to a case from the Eastern District of Michigan, *Buletini v. INS*, 860 F. Supp. 1222 (E.D. Mich. 1994). The court there concluded that satisfying the regulatory criteria was sufficient for an alien to be "deemed to have extraordinary ability unless the INS sets forth specific and substantiated reasons for its finding that the alien, despite having satisfied the criteria, does not meet the extraordinary ability standard." *Id.* at 1234. The court partially relied on guidance from the then Acting Assistant Commissioner for Examinations of the INS which indicated that "meeting three of the criteria for extraordinary aliens . . . is sufficient to establish the caliber of the alien." *Id.* However, an agency's choice to issue a new interpretation, conflicting with an old interpretation, does not require a notice-and-comment period. In fact, even where an interpretation "deviates significantly from one the agency ha[d] previously adopted," the Supreme Court has held notice and comment is not required. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

Therefore, because the policy manual set forth an interpretive rule clarifying the sequence in which agency adjudicators evaluate evidence, the Court finds that the rule did not require a notice-and-comment period under the APA.

### 3. *USCIS's Denial was not Arbitrary or Capricious*

Plaintiffs argue that USCIS's denial was arbitrary or capricious for two reasons. First, Plaintiffs argue the decision was not supported by substantial evidence because USCIS failed to properly assess expert letters submitted in support of her petition and that USCIS improperly discounted the letters as "fabricated." Second, Plaintiffs argue that USCIS improperly discounted

Dr. Viswanadha being the inventor of two registered patents. The Court addresses each of these arguments in turn.

The Court first finds that USCIS's analysis of the letters was reasonable. Zimmer submitted multiple letters in support of the petition. Generally speaking, these letters were written by other experts and described how Dr. Viswanadha's research contributed to ciliary biology. For example, Dr. Winfield Sale, Professor of cell biology at Emory University Hospital, acknowledged that Dr. Viswanadha's research "revealed for the first time that the ciliary dyneins are assembled as very large complexes and then, intact complexes, are transported to the cilium for final assembly." (R. 83.) Similar letters were submitted by other experts. (R. 898, 922–46, 1158–1425.) USCIS ultimately concluded these letters did not offer specific examples of how her findings have "been widely utilized in the cell biology field" or have "affected the field of cell biology in a substantial way that signifies international recognition or outstanding achievement in the academic field." (R. 7–8.) Plaintiffs argue that USCIS's statement discounting the significance of these letters was "not supported by the evidence." (DE 24 at 13.) They assert that the USCIS's decision was "clearly misguided" due to the "specific examples" from the letters showing the impact on the field. (*Id.*)

The Court disagrees. A decision "is unsupported by substantial evidence when the record lacks evidence that a reasonable mind might accept as adequate to support the conclusion." *Dep't of Workforce Dev.-Div. of Vocational Rehab. v. United States Dep't of Educ.*, 980 F.3d 558, 566 (7th Cir. 2020) (internal quotation marks and citation omitted). Here, USCIS came to a reasonable conclusion when it discounted the letters submitted on behalf of Dr. Viswanadha and found that they did not establish she was internationally recognized as outstanding in cell biology and physiology.

A reasonable mind could find that, while the letters may have supported Dr. Viswanadha making a contribution to the narrow subfield of ciliary biology, they did not indicate she made a substantial contribution to the broader field of cell biology and physiology. In its decision, the AAO provided two reasons why "cell biology and physiology," rather than "ciliary biology," was the proper frame of reference to analyze Dr. Viswanadha's contributions. First, the AAO reasoned that Dr. Viswanadha had listed her academic field as "cell biology and physiology" in her initial petition and Dr. Viswanadha could not change her field in the middle of her appeal, writing that "[a] petitioner may not make material changes to a petition in an effort to make a deficient petition conform to USCIS requirements." (R. 3 n.2 (citing *Matter of Izummi*, 22 I&N Dec. 169, 176 (Assoc. Commir' 1998).) Second, Zimmer submitted no evidence that ciliary biology could qualify as an "academic field" under the applicable regulation, which indicates that very narrow fields of study or niche sub-fields do not constitute an "academic field." 8 C.F.R. § 204.5(i)(2) (defining academic field as a "body of specialized knowledge offered for study at an accredited United States university or institution of higher education"). Given that Zimmer failed to submit evidence that ciliary biology existed as an academic field, and failed to list this as Dr. Viswanadha's field in the initial petition, it was reasonable for the AAO to examine Dr. Viswanadha's impact on the entire field of cell biology and physiology, as opposed to her impact on the sub-field of ciliary biology. Furthermore, because the letters submitted predominantly speak about Dr. Viswanadha's contribution towards ciliary biology,[7] without

---

[7] The experts largely discuss impacts to the field of "ciliary biology" without mentioning the broader field of "cell biology." For example, Dr. Sale opined that the beneficiary "took a very creative and unusually productive approach that revealed for the first time that the ciliary dyneins are assembled as very large complexes . . . and then, as intact complexes, are transported to the cilium for final assembly." (R. 83.) Dr. Kamiya wrote that Dr. Viswanadha "took a unique approach to combine genetics, biochemistry, and microscopy to demonstrate for the first time that the ciliary dynein, I1, is fully assembled in the cytoplasm and then transported to the cilium for final assembly . . . ." (R. 87.) Both Dr. King and Dr. Pigino's letters also focused specifically on how Dr. Viswanadha's research contributed to "understanding . . . the mechanisms governing ciliary dynein assembly and transport." (R. 93, 148–49.) Each of

providing any specific examples as to how her research impacted the broader field of cell biology and physiology, it was reasonable for the AAO to conclude that the letters did not show that she was internationally recognized as outstanding in cell biology and physiology.

In their reply, Plaintiffs argue that the field of ciliary biology is found "within the field of cellular biology" and so demonstrating that she is outstanding in that sub-field should be sufficient. (DE 29 at 4.) However, such a reading not only conflicts with the text of the regulation, but also the statute itself. Under 8 U.S.C. § 1153 (b)(1)(B)(i), an alien must be "recognized internationally as outstanding in a *specific academic area*[.]" The regulations then clarify that, when determining if a researcher is outstanding in an *academic field*, "'academic field' means a body of specialized knowledge offered for study at an accredited United States university or institution of higher education." 8 C.F.R. § 204.5(i)(2) (emphasis added). In other words, the statute's language, using "academic area," and the regulation, using "academic field," both indicate that the proper field of reference is related to some field or area that exists within academia. As discussed above, Plaintiffs did not provide any evidence that ciliary biology is a separate body of knowledge offered for study at an institution of higher education.

That the regulations and the agency define "academic area" and "academic field" to include only those bodies "of specialized knowledge offered for study at an accredited United States university or institution of higher education" is in line with purpose and structure of the statute. The EB-1 category of visa is the highest preference category out of the five categories. If

---

these experts merely discussed the impact of Dr. Viswanadha on a narrow sub-field without providing any detailed explanation for how her research established her as internationally recognized in cell biology. In fact, even the expert whom Plaintiffs quote at length, Dr. Mitchison, only vaguely wrote that "Dr. Viswanadha's research on the mechanisms of dynein assembly and subsequent discovery of genes like ADA3 is a significant step forward in the field of cell biology." (R. 923.) However, Dr. Mitchison failed to specify how Dr. Viswanadha's research specifically led to this "significant step forward" in the broader field. The AAO, therefore, came to the reasonable conclusion that Dr. Mitchison's letter, and the other letters, failed to provide "specific examples of how her findings . . . have been widely utilized in the cell biology field, or have otherwise influenced her field at a level commensurate with being internationally recognized as outstanding." (R. 7.)

a researcher were able to narrowly slice a field of study to suit their narrow subfield, then proving that individual is truly "outstanding" and internationally recognized in a given academic area becomes a hollow requirement devoid of meaning. Many professors who are little known to the field at large could become outstanding or the best in a given field if the field is defined narrowly enough to suit their specific area of expertise. Defining the academic field to be sufficiently broad avoids allowing areas to be engineered to suit an applicant researcher's or professor's niche expertise and permits only those individuals who are truly outstanding in a recognized academic area to receive a visa. Accordingly, the AAO's decision not to evaluate Dr. Viswanadha's impact on the narrow field of "ciliary biology," but rather the academic field of "cell biology and physiology," corresponds with the purpose, structure, and meaning of the statutory and regulatory text.

The Court notes that other cases have similarly held that individuals who have demonstrated they are outstanding in one area do not necessarily demonstrate they are outstanding in closely related areas. For example, in *Lee v. Ziglar*, a coach for the Chicago White Sox petitioned for an extraordinary ability visa as "professional baseball coach." *Lee v. Ziglar*, 237 F. Supp. 2d 914, 916 (N.D. Ill. 2002). The court acknowledged that the applicant was "arguably one of the most famous baseball players in Korean history." *Id.* at 915. The applicant offered substantial evidence confirming that he "was an outstanding foreign professional baseball player . . . presented letters from top officials in the Korean Baseball Organizations," certificates confirming his statistics, his receipt of national awards (including five Golden Glove awards, a season MVP, and a triple crown title), and newspaper articles relating to his sixteen-year career. *Id.* at 915–918. Despite this evidence, the court held that the denial of his petition was reasonable because "the record only shows Lee's achievements as a player, not a coach,

26

which are markedly different roles" and the agency's "distinction between extraordinary ability as a coach and a player is a reasonable one, entitled to deference." *Id.* at 917. Like Lee, USCIS's distinction between a field and a sub-field is a manifestly reasonable one, maintaining the high bar envisioned by 8 U.S.C. § 1153 (b)(1)(B). This distinction is therefore entitled to deference.

Plaintiffs next raise a different argument concerning the letters, asserting that the NSC's conclusion that the "letters from independent experts from across the globe appear to be fabricated by the petitioner, the beneficiary, or by Counsel" was patently false and renders the conclusions of the AAO as to the weight of the evidence arbitrary and capricious. (DE 24 at 15.) However, on appeal, the AAO rejected the NSC's analysis and "withdr[e]w" the "unsubstantiated claim" of fabrication." (R. 4) The AAO then conducted a thorough analysis of the letters, specifically discussing the letters submitted by Dr. Sale, Dr. Mitchison, Dr. Kamiya, Dr. King, and Dr. Pigino,[8] and explaining that while these letters may have shown that she made certain discoveries in the "cilia field," they failed to provide "specific examples indicating that [her] work has affected the field of cell biology in a substantial way that signifies international recognition or outstanding achievement in the academic field." (R. 7–8.)

It is the AAO's final decision, not the NSC's intermediary decision, which is relevant to this Court's analysis. This Court is only tasked with reviewing agency actions that are considered "final." 5 U.S.C. § 704. Meaning, the "action must mark the consummation of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature —" and the "action must be one by which rights or obligations have been determined." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (internal quotation marks and citations

---

[8] Even though the AAO only discussed a sample "of the letters of support," it indicated it "reviewed and considered each one." (R. 7 n.13.)

omitted)). Here, it is the AAO's decision which is considered "final," not the NSC's. *See Quality Truck & Trailer Repair, Inc. v. Johnson*, No. 13-CV-05527, 2014 WL 3906511, at *2 (N.D. Ill. Aug. 11, 2014) ("[T]he Court is really asked to review the final administrative decision of the AAO under the Administrative Procedure Act ("APA")); *Baldwin Dairy, Inc. v. United States*, 122 F. Supp. 3d 809, 810 (W.D. Wis. 2015) (plaintiffs "seek judicial review of the AAO's final decision"). Accordingly, because the AAO withdrew the accusation that the letters were fabricated, and then provided its own well-reasoned, independent analysis, the Court finds that no reversible error was committed due to the earlier statement by the NSC.

Next, Plaintiffs argue that USCIS's decision is not supported by substantial evidence because it erred in its analysis of the "two registered patents" on which Dr. Viswanadha was listed as an inventor. The USCIS concluded (1) that multiple of the patents were "provisional patent applications" and evidence was not submitted showing the patents were granted and (2) that, even if granted, "a patent recognizes the originality of the idea . . . [and] does not by itself demonstrate that the inventor has made a research contribution to the academic field that signifies international recognition or outstanding achievement." (R. 9.) Plaintiffs assert that this conclusion is incorrect, relying on the case *Zizi v. Cuccinelli*, No. 20-CV-07856-SVK, 2021 WL 2826713, at *1 (N.D. Cal. July 7, 2021). In that case, the applicant was applying for an extraordinary ability visa. The court, after examining evidence submitted regarding a patent, found that the "AAO's findings on Plaintiff's evidence of original scientific contributions of major significance in the field" was arbitrary and capricious. *Id.* at 2.

However, there are several features distinguishing that case from the instant case. First, that case only concerned the first step of the *Kazarian* analysis in the context of an extraordinary visa application. USCIS never moved onto the second step of the *Kazarian* analysis where it

"weigh[s] the documentation offered" to ensure it demonstrates extraordinary ability. *Id.* Rather, USCIS stopped its analysis at step one: determining that the applicant didn't meet the regulatory criteria. In the instant case, USCIS found Dr. Viswanadha met two of the six regulatory criteria and moved on to the second step where it had to weigh the entirety of the record to ensure it met the high level of expertise required. This second stage review requires a deeper look at the quality of the patent applications submitted. Second, and most importantly, the applicant in *Zizi* submitted evidence beyond the patent applications themselves. The applicant there included evidence showing that he was engaged with several other parties in "advanced licensing negotiations" for the patent, that other experts concluded that the technology "will impact sectors across a wide spectrum," that the applicant's patented drugs "obtained the first positive result in relevant cancer animal model[s] last year," and that he was "currently . . . in contact with major pharmaceutical companies . . . ." *Id.* at 3–4. Unlike the applicant in *Zizi*, there has not been evidence showing that Dr. Viswanadha's patents have had a significant impact on her academic field. Therefore, that case is inapposite and the Court finds that USCIS's conclusion regarding that evidence was reasonable.

Indeed, the AAO's entire decision appears to be highly detailed and well-reasoned. In addition to examining the letters and patents, as discussed above, the AAO scrupulously examined evidence that Dr. Viswanadha judged the work of others (R. 5–6), provided input on a research paper receiving invitations to speak at conferences (R. 6), co-authored a chapter in a book (*Id.*), participated in certain presentations (*Id.*)[9], developed tissue models in a prior job (R.

---

[9] The AAO found this evidence did not support Dr. Viswanadha being recognized internationally within cell biology and physiology as outstanding. First, as to the evidence of judging, the petition did not establish the "requirements for selection of judges" and failed to show that "participation in th[ose] events involved judging the work of others in the field of cell biology and physiology." In other words, she failed to show whether judging this competition indicated that its judges were recognized internationally as outstanding in cell biology. Second, merely "receiving invitations to review manuscripts, to provide input for conferences, or to speak at conferences based on subject

9), authored five articles which had been cited over 53 times,[10] received impact awards from her employer, was a post-doctoral fellow for the American Heart Association, and was a member of various professional organizations.[11] For each of these categories of evidence, the AAO provided a thorough, well-thought analysis explaining why the evidence did not demonstrate that Dr. Viswanadha was internationally recognized as an outstanding researcher in the field.

While the Plaintiffs may disagree with some of USCIS's conclusions, this does not mean that the conclusions were arbitrary, capricious, or unsupported by substantial evidence. Rather, as shown above, the USCIS conducted a thorough analysis, considered the relevant factors, and reached a reasonable conclusion. Accordingly, even though Dr. Viswanadha is a "skilled biomedical researcher" who has produced valuable work (R. 12), that is not the same as being "internationally recognized" as outstanding under the statute and the Court must uphold USCIS's reasonable decision to deny Zimmer's petition. *See Boucher v. United States Dep't of Agric.*, 934 F.3d 530, 547 (7th Cir. 2019) (when considering if an agency's decision was arbitrary or

---

matter expertise" did not provide strong support "because possessing expertise in a given field is a considerably lower threshold than being recognized internationally within the academic field as outstanding." (R. 6–7.)

[10] The AAO found that Dr. Viswanadha's articles and the citations to those articles did not demonstrate outstanding achievement in the academic field. The AAO noted that authoring scholarly articles is "often inherent to the work of professors and researchers" but that the number of citations could be an indicator to determine whether the applicant was internationally recognized as outstanding. However, the AAO concluded that the petitioner failed to show that Dr. Viswanadha was recognized internationally as outstanding in biology because she did not submit "comparative statistical evidence indicating how often others in the Beneficiary's field are cited," did not show that the citations that existed weren't from herself, and the articles which did cite to her work did not "distinguish or highlight" her research. (R. 10–11.)

[11] The AAO concluded that the fellowship, impact awards, and membership in professional organizations did not demonstrate that Dr. Viswanadha was recognized internationally as outstanding in cell biology. (R. 11–12.) First, the AAO concluded that the fellowship funded "research and clinical training for promising *students*," which did not demonstrate she was internationally recognized as outstanding in cell biology. (*Id.*) Next, the AAO concluded that the impact awards were provided by her employer and reflected "internal recognition rather than international recognition in her field." (R. 11.) Finally, the AAO concluded that there was no evidence that the professional organizations "require[d] outstanding achievements of their members or that acceptance into their membership signifies international recognition in the Beneficiary's academic field." (R. 12.)

capricious, a court "must uphold the action if the agency considered all the relevant factors and we can discern a rational basis for the agency's choice").

**D.      Conclusion**

For the reasons stated above, the Court DENIES Plaintiffs motion for summary judgment. (DE 24.) The Court GRANTS Defendants' cross motion for summary judgment. (DE 27.) Judgment is entered in favor of the Defendants and the Clerk is directed to close the case.

SO ORDERED.

ENTERED: March 8, 2023

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court